# EXHIBIT 8

**Comment:**

*a. History.* Until the mid-1960s, the only transactions that gave rise to what today is known as "products liability" were commercial product sales, as defined in Subsection (a). In large part this limitation reflects the origins of liability without fault in the law of warranty, which has traditionally focused on sales transactions. During the formative years in the development of strict products liability, courts extended liability to some nonsale transactions, but always by assimilating such transactions to sales. Section 402A of the Restatement, Second, of Torts, approved in 1964, limited itself to "one who *sells* a product in a defective condition...." (Emphasis added). After the promulgation of § 402A, courts began to extend strict liability for harm caused by product defects to some nonsale commercial transactions involving the distribution of products. Rather than stretching to call these transactions "sales," courts simply declared that the same policy objectives that supported strict liability in the sales context supported strict liability in other contexts. The first significant extension involved commercial product lessors. Although title does not pass in lease transactions, courts have reasoned that the same policy objectives that are served by holding commercial product sellers strictly liable also apply to commercial product lessors. Over time, courts have extended strict products liability to a wide range of nonsale, nonlease transactions.

*b. Product sales and giveaways.* Sales occur at all levels in the distributive chain including manufacturer sellers, wholesale sellers, and retail sellers. Food served in a restaurant is sold to the customer, as are products given away free of separate charge in the context of a commercial sales promotion. Thus, businesses are liable for defects in free samples or defects in products given away for other promotional purposes. Even if the final transaction through which a defective product reaches the plaintiff is not a commercial sales transaction, with the result that products liability is not imposed on the final transferor—as when one buys a soft drink at a store and then gives it to a friend—a plaintiff may recover in tort for resulting harm against all commercial sellers who sold the product in a defective condition.

*c. Commercial product leases.* A commercial lessor of new and like-new products is generally subject to the rules governing new product sellers. When an individual rents a new or an almost-new used product on a short-term basis, with the lessee having no opportunity to inspect the product or adequately to assess its condition, and the product unit is drawn from a pool of rental units that includes new and

almost-new used units with no attempt by the leasing agent to distinguish among units on the basis of age and condition, the lessor is subject to liability as if it were the retail seller of a new product. When the rental units are in obviously used condition, liability of the lessor depends on the rules stated in § 8.

*d. Sales-service combinations.* When the same person provides both products and services in a commercial transaction, whether a product has been sold may be difficult to determine. When the product and service components are kept separate by the parties to the transaction, as when a lawn-care firm bills separately for fertilizer applied to a customer's lawn or when a machinery repairer replaces a component part and bills separately for it, the firm will be held to be the seller of the product. This is especially true when the parties to the transaction explicitly characterize the property aspect as a sale.

When the parties do not clearly separate the product and service components, courts differ in their treatment of these so-called "sale-service hybrid transactions." These transactions tend to fall into two categories. In the first, the product component is consumed in the course of providing the service, as when a hair dye is used in treating a customer's hair in a salon. Even when the service provider does not charge the customer separately for the dye, the transaction ordinarily is treated as a sale of the material that is consumed in providing the service. When the product component in the sale-service transaction is not consumed or permanently transferred to the customer—as when defective scissors are used in the hair salon—the transaction ordinarily is treated as one not involving a sale of the product to the customer. But while the salon is not a seller, all commercial sellers in the chain of distribution of the scissors, from the manufacturer through the retailer who sold them to the salon, are clearly sellers of the scissors and are subject to liability to the salon customer under the rules of this Restatement. It should be noted that, in a strong majority of jurisdictions, hospitals are held not to be sellers of products they supply in connection with the provision of medical care, regardless of the circumstances.

*e. Other means of commercial distribution: finance leases.* A finance lessor, as distinct from a commercial lessor under Comment *c*, is not subject to the rule of this Section in the absence of active participation in the underlying commercial product distribution.

*f. Other means of commercial distribution: product bailments.* Bailments typically involve short-term transfers of possession. Several categories of cases are fairly clear. When the defendant is in the business of selling the same type of product as is the subject of the bailment, the seller/bailor is subject to strict liability for harm caused

286

by defects. Thus, an automobile dealer who allows a prospective customer to test-drive a demonstrator will be treated the same as a seller of the demonstrator car. Even when sale of a product is not contemplated, the commercial bailor is subject to strict liability if a charge is imposed as a condition of the bailment. Thus, a laundromat is subject to strict liability for a defective clothes dryer, and a roller rink that rents skates is treated similarly. When products are made available as a convenience to customers who are on the defendant's premises primarily for different, although related purposes, and no separate charge is made, strict liability is not imposed. Thus, bowling alleys that supply bowling balls for customer use and markets that supply shopping carts are not subject to strict products liability for harm caused by defects in those items. Similarly, doctors who use medical devices while treating patients are not considered distributors of those products.

    *g. Other means of commercial distribution: product distribution facilitators.* Persons assisting or providing services to product distributors, while indirectly facilitating the commercial distribution of products, are not subject to liability under the rules of this Restatement. Thus, commercial firms engaged in advertising products are outside the rules of this Restatement, as are firms engaged exclusively in the financing of product sale or lease transactions. Sales personnel and commercial auctioneers are also outside the rules of this Restatement.

### REPORTERS' NOTE

    *a. History.* Cases involving actual sale include Hiigel v. General Motors Corp., 544 P.2d 983 (Colo.1975) (manufacturer); Seattle–First Nat'l Bank v. Volkswagen of Am., Inc., 525 P.2d 286 (Wash.Ct.App.1974) (importer/wholesaler); Webb v. Zern, 220 A.2d 853 (Pa.1966) (distributor); Vandermark v. Ford Motor Co., 391 P.2d 168 (Cal.1964) (retailer). Sales may occur independently of the provision of services; and they may also occur in the context of so-called "sales-service combination." See § 20(c).

    When confronted with nonsale situations to which the logic of strict products liability applied, historically courts tended to stretch the word "sell" to cover new situations. This Restatement, acknowledging that strict products liability applies to these nonsale methods of distribution, designates them with the phrase "otherwise distributes." In these areas into which strict products liability is expanding, courts frequently consider public policy in making their decisions. See, e.g., Newmark v. Gimbel's Inc. (infra, under *Sales-service combinations*) and Peterson v. Superior Court (infra, under *Commercial product leases*).

    *b. Product sales and giveaways.* Once something has been deemed to be a "product," it remains to be determined whether the product was "sold" or "otherwise distributed" by the defendant. Thus, a commercial entity is subject to strict liability for products it distributes free of charge,

since title has passed to the consumer. See, e.g., McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967) (free sample); Perfection Paint & Color Co. v. Konduris, 258 N.E.2d 681 (Ind.Ct.App.1970) (free lacquer thinner supplied following sale of lacquer that did not bond properly); Levondosky v. Marina Assocs., 731 F.Supp. 1210 (D.N.J.1990) (defective glass in which free drink was served by casino). Plaintiffs also have been able to recover for harm caused by defective products prior to actual purchase. See, e.g., Barker v. Allied Supermarket, 596 P.2d 870 (Okla.1979) (implied warranty of merchantability in self-service store); Gillispie v. Great Atl. & Pac. Tea Co., 187 S.E.2d 441 (N.C.Ct.App.1972) (jury question on sale and implied warranty of bottle that exploded in self-service store before customer had paid for it). Although these cases were tried under the Uniform Commercial Code, they support the idea that the seller is liable when the product has been placed into the stream of commerce even though the customer has not yet paid for it. The same reasoning would apply under strict products liability.

   c. *Commercial product leases.* The most significant extension of the boundaries of strict products liability is the inclusion of commercial product lessors in the category of suppliers held strictly liable for product defects. See, e.g., Samuel Friedland Family Enterprises v. Amoroso, 630 So.2d 1067 (Fla.1994); Kemp v. Miller, 453 N.W.2d 872 (Wis.1990).

   In a landmark decision, the Supreme Court of New Jersey held the commercial lessor of a truck fleet strictly liable for injuries to the driver-employee of the lessee. See Cintrone v. Hertz Truck Leasing & Rental Serv., 212 A.2d 769 (N.J.1965). Relying doctrinally upon implied warranty concepts, the court concluded that "the relationship between the parties fairly calls for implied warranty of fitness of use, at least equal to that assumed by a new car manufacturer." Commentators have praised this decision as consistent with the policy objectives of strict products liability. See, e.g., Comment, Strict Liability of the Bailor, Lessor and Licensor, 57 Marq. L. Rev. 111 (1973); Comment, Products Liability—Liability of the Bailor for Hire for Personal Injuries Caused by Defective Goods, 51 N.C. L. Rev. 786 (1973); Annotation, Application of Strict Liability in Tort Doctrine to Lessor of Personal Property, 52 A.L.R.3d 121 (1973).

   Courts have imposed strict liability on commercial lessors of a broad range of products, including motor vehicles (see, e.g., Stewart v. Budget Rent-a-Car Corp., 470 P.2d 240 (Haw. 1970); Galluccio v. Hertz Corp., 274 N.E.2d 178 (Ill.App.Ct.1971), superseded by statute; Stang v. Hertz Corp., 497 P.2d 732 (N.M.1972)); aircraft (see, e.g., George v. Tonjes, 414 F.Supp. 1199 (W.D.Wis.1976) (applying Wisconsin law); Bachner v. Pearson, 479 P.2d 319 (Alaska 1970); Rudisaile v. Hawk Aviation, Inc., 592 P.2d 175 (N.M.1979)); tools (see, e.g., McClaflin v. Bayshore Equip. Rental, 79 Cal.Rptr. 337 (Cal.Ct.App.1969)); and sailboats (see, e.g., Samuel Friedland Family Enterprises v. Amoroso, 630 So.2d 1067 (Fla.1994)).

   By contrast with commercial lessors, financial lessors are not held strictly liable in the absence of active participation in the underlying commercial product distribution. See, e.g., Brescia v. Great Road Realty Trust, 373 A.2d 1310 (N.H.1977); Nath v. Nat'l Equip. Leasing Corp.,

439 A.2d 633 (Pa.1981) ("[A] finance lessor is not in the business of selling or marketing merchandise. A finance lessor is in the business of circulating funds. Such an activity cannot possibly produce reasonable reliance upon the safety of the merchandise."); Cole v. Elliott Equip. Co., 653 F.2d 1031 (5th Cir.1981) (applying Texas law); Abco Metals Corp. v. Equico Lessors, Inc., 721 F.2d 583 (7th Cir.1983) (applying Illinois law); Wright v. Newman, 735 F.2d 1073 (8th Cir.1984) (applying Missouri law); Bickram v. Case I.H., 712 F.Supp. 18 (E.D.N.Y. 1989) (applying New York law); Dominguez Mojica v. Citibank, N.A., 830 F.Supp. 668 (D.P.R.1993) (applying Puerto Rico law).

One category of leases, those involving real property, present special problems. Traditionally landlords were not held strictly liable for latent defects in the premises. Although that may still be the majority rule, some jurisdictions hold landlords strictly liable for defects in the premises. See, e.g., Kaplan v. Coulston, 381 N.Y.S.2d 634, 638 (N.Y.Civ.Ct. 1976) ("a landlord is in a similar position to a seller ... and a tenant is in a similar position to a purchaser"). Other jurisdictions limit landlord liability to nonstructural items. See, e.g., Armstrong v. Cione, 738 P.2d 79, 85 (Haw.1987) (strict liability does not apply because "the shower and its door were an integral part of the structure of the apartment building and there is no evidence that [the landlord] installed the shower"); Boudreau v. General Elec. Co., 625 P.2d 384 (Haw.App.1981) (landlord can be held strictly liable for explosion in washer/dryer unit that he installed). Other jurisdictions do not hold the landlord strictly liable at all. See, e.g., Dwyer v. Skyline Apartments, Inc., 123 N.J.Super. 48, 56, 301 A.2d 463, 467 (N.J.Sup.Ct.App.Div.1973), aff'd., 311 A.2d 1 (N.J.1973) ("to apply the broad brush of strict liability to the landlord-tenant relationship in a dwelling house would impose an unusual and unjust burden on property owners"); Old Town Dev. Co. v. Langford, 349 N.E.2d 744 (Ind.Ct. App.1976) (defective heating system caused fire resulting in injury and deaths).

Hotel operators, however, generally are not held strictly liable for inherent defects in fixtures or furnishings. See, e.g., Wagner v. Coronet Hotel, 458 P.2d 390 (Ariz.App.1969) (hotel-guest relationship is that of inviter-invitee); Peterson v. Superior Court, 899 P.2d 905 (Cal.1995) (hotel not strictly liable to guest who slipped in allegedly defective shower; overruling Becker v. IRM Corp., 698 P.2d 116 (Cal.1985)); Ranalli v. Edro Motel Corp., 690 A.2d 137 (N.J.Super.1997) (motel owner not strictly liable for defective frying pan supplied to a guest); Livingston v. Begay, 652 P.2d 734 (N.M.1982) (asphyxiation by carbon dioxide from disconnected exhaust pipe).

*d. Sales-service combinations.* No unifying test has been devised to determine whether strict liability applies in any given sales-service combination.

Hybrid cases often arise in the medical context, as when a surgeon uses defective forceps during an operation. Most jurisdictions hold that hospitals and doctors provide a service—medical treatment—and immunize them from strict liability for harm from defective products used in medical treatment, whether the product is implanted in the patient, loaned to the patient, or merely used as a tool. See, e.g., Vergott v. Deseret

289

Pharm. Co., Inc., 463 F.2d 12 (5th Cir.1972) (applying Texas law) (hospital not strictly liable for catheter that broke, necessitating open-heart surgery); Magrine v. Krasnica, 227 A.2d 539 (N.J.Co.Ct.1967) (dentist not strictly liable for hypodermic needle which broke, leaving portion in patient's jaw); Silverhart v. Mount Zion Hosp., 98 Cal.Rptr. 187 (Cal.Ct.App. 1971) (hospital not strictly liable for surgical needle that broke during operation); Hector v. Cedars–Sinai Med. Ctr., 225 Cal.Rptr. 595 (Cal.Ct.App. 1986) (hospital not strictly liable for defective pacemaker implanted in patient); Porter v. Rosenberg, 650 So.2d 79 (Fla.App.1995) (physician who supplied patient with prosthesis in breast implant procedure not strictly liable; see n.1, collecting authorities); Goldfarb v. Teitelbaum, 540 N.Y.S.2d 263 (N.Y.App.Div.1989) (dentist not strictly liable for defective mandibular prosthesis placed in patient's mouth); Podrat v. Codman–Shurtleff, Inc., 558 A.2d 895 (Pa.Super.Ct.1989) (hospital not strictly liable for forcep, the tip of which broke off and lodged in patient's spine); Johnson v. Mountainside Hosp., 571 A.2d 318 (N.J.Super.Ct.App.Div.1990) (hospital not strictly liable for defective respirator loaned to patient); Cafazzo v. Central Med. Health Serv., Inc., 635 A.2d 151 (Pa.Super.Ct.1993) (neither doctor nor hospital strictly liable for defective prosthesis implanted in patient's jaw). Public policy supports this immunity. See, e.g., Newmark v. Gimbel's Inc., 258 A.2d 697, 703 (N.J. 1969) ("[T]he nature of the [medical] services, the utility of and the need for them, involving as they do, the health and even survival of many people, are so important to the general welfare as to outweigh in the policy scale any need for the imposition on dentists and doctors of the rules of strict liability in tort."). But see Bell v. Poplar Bluff Physicians Group, 879 S.W.2d 618 (Mo.Ct.App.1994) (holding the hospital as a seller of a surgical implant); Parker v. St. Vincent Hosp., 919 P.2d 1104 (N.M.Ct.App.1996) (limiting immunity of hospital from strict liability to claims of design defects in medical products chosen by the treating physician).

Interesting questions arise in the medical context when the product is not integrally associated with the medical treatment. One court refused to hold a hospital strictly liable for latent defects in the premises. This court reasoned that the provision of a hospital room was "an integral part of its delivery of professional medical service." Pierson v. Sharp Mem. Hosp., Inc., 264 Cal.Rptr. 673 (Cal.Ct. App.1989). Other courts have held that a hospital is strictly liable for harm caused by defective products not immediately related to medical treatment. See, e.g., Thomas v. St. Joseph Hosp., 618 S.W.2d 791 (Tex. Civ.App.1981) (patient's hospital gown caught fire from match); Johnson v. Sears, Roebuck & Co., 355 F.Supp. 1065 (E.D.Wis.1973) (hospital can be held strictly liable for "mechanical and administrative services").

Courts are likely to apply strict liability in nonmedical sales-service combinations in which the product is used up or consumed. See, e.g., Newmark v. Gimbel's Inc., 258 A.2d 697 (N.J.1969) (beauty parlor held strictly liable for permanent wave solution); Villari v. Terminix Int'l, Inc., 692 F.Supp. 568 (E.D.Pa.1988) (applying Pennsylvania law) (pest control company strictly liable for product used in termite control). Similarly, a contractor/remodeler was held to have "manufactured" and "sold" a propane

gas piping system that leaked, resulting in a fire. See Worrell v. Barnes, 484 P.2d 573 (Nev.1971). If the product is not used up or consumed, the transaction is usually not treated as a sale of the product, but rather as a service. See, e.g., Coleman v. Charlesworth, 608 N.E.2d 464 (Ill.App.Ct. 1992) (sightseeing balloon ride is a service); Siciliano v. Capitol City Shows, Inc., 475 A.2d 19 (N.H.1984) (amusement ride is a service, not a product); Allen v. Nicole, Inc., 412 A.2d 824 (N.J.Super.Ct.Law Div. 1980) (amusement ride operator is more a consumer of the equipment than a seller).

*f. Other means of commercial distribution: product bailments.* Distributors of demonstration models have been held strictly liable for harm caused by defects. See, e.g., First Nat'l Bank of Mobile v. Cessna Aircraft Co., 365 So.2d 966 (Ala.1978) (strict liability is applicable when a product is placed in the stream of commerce by demonstration); Robert F. Bullock, Inc. v. Thorpe, 353 S.E.2d 340 (Ga.1987) (deep-fat fryer placed in restaurant kitchen on trial basis); Delaney v. Towmotor Corp., 339 F.2d 4 (2d Cir.1964) (applying New York law) (demonstrator fork-lift truck).

When a sale is not contemplated, but a separate charge is imposed as a condition of the bailment, the bailor typically is held strictly liable for harm caused by the defective bailed product. See, e.g., Garcia v. Halsett, 82 Cal.Rptr. 420, 423 (Cal.Ct.App. 1970) (laundromat customer "is actually in a worse position than a retail buyer or member of the buyer's family"); Golt v. Sports Complex, Inc., 644 A.2d 989 (Del.Super.Ct.1994) (go-cart track operator was strictly liable for defective go-cart rented to plaintiff); Wilson v. Dover Skating Ctr., Ltd., 566 A.2d 1020, 1024 (Del.Super.Ct.1989) (rental of roller skates is "an integral and essential part of defendant's profit-oriented operation"). Anomalously, a municipal golf course was not held strictly liable for harm caused by a defective rental golf cart. Katz v. Slade, 460 S.W.2d 608 (Mo. 1970). Amusement ride operators, however, are considered to provide a service, not a product, and thus are not held strictly liable. See, e.g., Siciliano v. Capitol City Shows, Inc., 475 A.2d 19 (N.H.1984) (amusement ride is more of a service than a product); Allen v. Nicole, Inc., 412 A.2d 824 (N.J.Super.Ct.Law Div.1980) (amusement ride operator is more a consumer of the equipment than a seller).

Bailors who furnish products that are an integral part of their sales or marketing operation are held strictly liable for harm caused by defective bailed products, even if a separate charge is not imposed. See Bainter v. Lamoine LP Gas Co., 321 N.E.2d 744, 746 (Ill.App.Ct.1974) (propane tank loaned to farmer by propane gas company was "a necessary incident of periodic sales of gas"); Fulbright v. Klamath Gas Co., 533 P.2d 316, 321 (Or.1975) ("sale of propane gas cannot logically be separated from the loan of the vine burner"); Gabbard v. Stephenson's Orchard, Inc., 565 S.W.2d 753 (Mo.Ct.App.1978) (orchard strictly liable for defective ladder furnished to "you-pick" customers). Thus, restaurants are held strictly liable for injuries from defects in their dishware. See, e.g., Shaffer v. Victoria Station, Inc., 588 P.2d 233 (Wash.1978) (wine glass broke, injuring customer's hand); Levondosky v. Marina Assocs., 731 F.Supp. 1210 (D.N.J.1990) (applying New Jersey law) (defective glass in which free drink was served).

Commercial bailors, who furnish products as a convenience for use by their customers on the bailors' business premises, but who do not charge separately for the product's use, typically are excluded from strict liability rules. See, e.g., Keen v. Dominick's Finer Foods, Inc., 364 N.E.2d 502, 505 (Ill.App.Ct.1977) ("The store, like its customer, is merely a user of the shopping cart."); Dixon v. Four Seasons, 424 A.2d 428 (N.J.Super.Ct.App.Div.1980) (bowling alley not strictly liable for defect in bowling ball); Gilliland v. Rothermel, 403 N.E.2d 759, 761 (Ill.App.Ct.1980) (tire gauge loaned to customer "was neither a necessary incident of the products which the defendant offered for sale nor an integral part of defendant's marketing operation"). Neither is the bailor held strictly liable when the product is furnished as a convenience and is used on the customer's business premises: Jones v. McCook Drum & Barrel Co., Inc., 595 N.E.2d 670 (Ill.App.Ct.1992) (defective semi-trailer full of purchased drums was left in customer company's yard for customer's convenience).

*g. Other means of commercial distribution: product distribution facilitators.* Sales personnel, sales representatives, and other sales facilitators are not subject to strict products liability. See, e.g., Dillard Dep't Stores, Inc. v. Associated Merchandising Corp., 782 P.2d 1187 (Ariz.App.1989) (non-profit merchandising organization is essentially providing a service); Alvarez v. Koby Mach. Co., Ltd., 516 N.E.2d 930 (Ill.App.Ct.1987) (sales facilitator); Lyons v. Premo Pharm. Labs, Inc., 406 A.2d 185 (N.J.Super.Ct.App.Div.1979) (broker never had control over product, and his passive role prevents holding him strictly liable); Memphis Bank & Trust Co. v. Water Serv., Inc., 758 S.W.2d 525 (Tenn.1988) (sales representative not subject to strict liability). But exclusive sales representatives or exclusive agents have been held strictly liable for harm caused by defective products. See, e.g., Bittler v. White & Co., Inc., 560 N.E.2d 979 (Ill.App.Ct.1990) (participatory connection with the defective product was sufficient to subject the exclusive sales representative to strict products liability); Brumbaugh v. CEJJ, Inc., 547 N.Y.S.2d 699, 701 (N.Y.App.Div.1989) (exclusive marketing agent was "a mandatory link in this distributive chain").

The relationship of auctioneers to products is similar to that of sales personnel; thus auctioneers also are not held strictly liable. See, e.g., Musser v. Vilsmeier Auction Co., Inc., 562 A.2d 279, 283 (Pa.1989) ("[An] auctioneer is ... an ad hoc salesman of the goods of another.... He bears no relationship to the manufacturer or the goods, beyond their immediate sale."); Tauber–Arons Auctioneers Co., Inc. v. Superior Court, 161 Cal. Rptr. 789 (Cal.Ct.App.1980) (treating auctioneer as dealer in used machinery).

Similarly, licensors of trademarks are not held strictly liable when they do not participate in the design, manufacture, or distribution of the licensee's product. See, e.g., Nelson v. International Paint Co., Inc., 734 F.2d 1084 (5th Cir.1984) (licensor not liable); Hebel v. Sherman Equip., 442 N.E.2d 199 (Ill.1982) (licensor not liable). When licensors do participate, they are strictly liable as sellers. See, e.g., Torres v. Goodyear Tire & Rubber Co., 786 P.2d 939 (Ariz.1990) (licensor liable); City of Hartford v. As-

sociated Constr. Co., 384 A.2d 390 (Conn.Super.1978) (licensor liable).

§ 21. Definition of "Harm to Persons or Property": Recovery for Economic Loss

For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to:

(a) the plaintiff's person; or

(b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or

(c) the plaintiff's property other than the defective product itself.

Comment:

  a. *Rationale.* This Section limits the kinds of harm for which recovery is available under this Restatement. Two major constraints on tort recovery give content to this Section. First, products liability law lies at the boundary between tort and contract. Some categories of loss, including those often referred to as "pure economic loss," are more appropriately assigned to contract law and the remedies set forth in Articles 2 and 2A of the Uniform Commercial Code. When the Code governs a claim, its provisions regarding such issues as statutes of limitation, privity, notice of claim, and disclaimer ordinarily govern the litigation. Second, some forms of economic loss have traditionally been excluded from the realm of tort law even when the plaintiff has no contractual remedy for a claim.

  b. *Economic loss resulting from harm to plaintiff's person.* Loss of earnings and reductions in earning capacity are common forms of economic loss resulting from harm to the plaintiff's person and are included in Subsection (a). Other forms of economic loss resulting from harm to the plaintiff's person are recoverable if they are within the general principles of legal cause. See Restatement, Second, Torts §§ 430–461.

  c. *When harm to another interferes with an interest of the plaintiff protected by tort law.* When tort law recognizes the right of a plaintiff to recover for economic loss arising from harm to another's person, that right is included within the rules of this Restatement Third, Torts: Products Liability. Thus, for example, actions under local common law and statutes for loss of consortium or wrongful death on behalf of next of kin, although not direct harms to the plaintiff's person, are included in Subsection (b). Other examples of such rights

293